UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TRACY M. WILLIAMS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | No. 1:13-cv-01592-JMS-DKL |
| | ) | |
| BRANDON BROOKS, *in his individual capacity*, | ) | |
| GREG KEHL, *in his individual capacity*, and | ) | |
| SHANNON TRUMP, *in her individual capacity*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## ORDER

Presently pending before the Court is a Motion for Summary Judgment filed by Defendants Brandon Brooks, Greg Kehl, and Shannon Trump. [Filing No. 40.] For the reasons that follow, the Court grants the motion.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R.

Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the

existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

A significant twist on the normal standard of review is at play here: When the record evidence includes a videotape of the relevant events, the Court should not adopt the non-movant's version of the facts when that version contradicts what is depicted on the videotape. *Scott v. Harris*, 550 U.S. 372, 379-80, 127 S.Ct. 1769 (2007) (where plaintiff's account of high-speed chase contradicted videotape of chase, and there were no allegations that videotape was "doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," lower court "should have viewed the facts in the light depicted by the videotape"). Accordingly, the Court relies primarily on videos taken from the dashboard cameras of the police vehicles present at the scene of Mr. Williams' traffic stop and arrest. [1]

## II.
### BACKGROUND

The Court finds the following to be the undisputed facts, supported by admissible evidence in the record:

### A.  The Initial Traffic Stop

Defendant Brandon Brooks has been a law enforcement officer for the City of Noblesville Police Department since 2009.  [Filing No. 42-1 at 1.]  He is a graduate of the Indiana Law Enforcement Academy ("ILEA") and has received all of the training required by the State of Indiana for his position as a police officer.  [Filing No. 42-1 at 1.]

---

[1] A DVD containing the four videos was filed at Filing No. 44.  The Court cites to three of those videos (with the relevant time on each video) as follows: (1) Brooks Video (dashboard camera video from Officer Brooks' police car from 1:18 a.m. to 1:52 a.m.); (2) Lindenschmidt Video (dashboard camera video from Officer David Lindenschmidt's police car from 1:26 a.m. to 2:07 a.m.); and (3) Kehl Video (dashboard camera video from Officer Gregory Kehl's police car from 1:27 a.m. to 1:35 a.m.).

On October 5, 2011 at approximately 1:15 a.m., Officer Brooks was on duty and travelling north on State Road 37 before its intersection with Greenfield Avenue in Noblesville. [Filing No. 42-1 at 1.] Approaching this intersection, State Road 37 has a dedicated left turn lane which begins approximately 600 feet from the intersection, splits from the inside lane, and is separated from the inside lane by a solid white line. [Filing No. 42-1 at 2; Filing No. 42-4.] Officer Brooks observed a Chrysler 300 – which he later learned was driven by Plaintiff Tracy Williams – move from the outside lane on State Road 37 to the left turn lane without activating its turn signal. [Filing No. 42-1 at 2.] Officer Brooks, who was approximately 100 to 150 feet behind Mr. Williams, also observed that Mr. Williams entered the turn lane several feet north of where the turn lane began, crossing the solid white line that divides the two lanes to do so. [Filing No. 42-1 at 2.] Officer Brooks observed that Mr. Williams did not activate his left turn signal until he had travelled several feet in the left turn lane, when he was about 100 feet from the intersection with Greenfield Avenue. [Filing No. 42-1 at 2.] Officer Brooks interpreted this signal to be for the turn onto Greenfield Avenue. [Filing No. 42-1 at 2.] Mr. Williams testified that his normal habit is to put his turn signal on as he enters a turn lane, but was not able to testify that he was certain he had done so that night. [Filing No. 42-5 at 3-4 (stating that he was "sure I did it the same way I usually do" and did not "know why I would do it in a different way," but that he did not "have a present memory of exactly that point" when he moved into the turn lane).]

Because Officer Brooks did not want Mr. Williams to pull over in the intersection, he waited to activate his emergency lights until after Mr. Williams began turning onto Greenfield Avenue. [Filing No. 42-1 at 2.] When he activated his emergency lights, Officer Brooks' camera inside his police vehicle turned on, recording approximately ten seconds before that moment and the events that followed. [Filing No. 42-1 at 2; Brooks Video at 1:18.]

Mr. Williams pulled into a gas station parking lot located on the northwest corner of the intersection of State Road 37 and Greenfield Avenue, and Officer Brooks pulled in behind him. [Brooks Video at 1:19.] Just as Officer Brooks exited his police vehicle and began to approach Mr. Williams' vehicle, Officer Greg Kehl arrived at the scene. [Filing No. 42-7 at 1.] Officer Kehl has been an officer with the Noblesville Police Department since 2007, is a graduate of the ILEA, and has received all of the training required by the State of Indiana for his position as a police officer. [Filing No. 42-7 at 1.]

When Officer Brooks approached Mr. Williams' vehicle, he observed that Mr. Williams' window was rolled down only two inches, which was an item of interest to Officer Brooks because he had learned in his training that lowering the window a small amount "is common to people who want to avoid detection by odor of their breath or inside of their car." [Filing No. 42-1 at 2.] Officer Brooks requested that Mr. Williams roll his window down, and he rolled it down approximately another inch. [Filing No. 42-1 at 2; Brooks Video at 1:19.] Officer Brooks then advised Mr. Williams why he had been pulled over, and asked him for his license and registration. [Brooks Video at 1:19.] Officer Brooks also asked Mr. Williams whether he had been drinking, and Mr. Williams advised that he had not. [Brooks Video at 1:20.] At that point, Officer Brooks did not observe any signs that Mr. Williams was intoxicated. [Filing No. 42-1 at 3.] Officer Brooks did believe, however, that Mr. Williams "had an attitude." [Filing No. 42-1 at 2.] Officer Brooks said to Mr. Williams "you're acting like you kind of have an attitude with me right now. Like I pulled you over for no reason." [Brooks Video at 1:20.] Mr. Williams responded that he normally puts his turn signal on, and that it had been a long day. [Brooks Video at 1:20.] Mr. Williams gave Officer Brooks his license and registration and Officer Brooks told him to "hang tight," and that he would be right back. [Brooks Video at 1:21-1:22.]

Officer Brooks returned to his car, ran Mr. Williams' license plate and registration, and determined that "[e]verything checked out."  [Filing No. 42-1 at 3.]  Although Officer Brooks believed that Mr. Williams had engaged in a traffic violation by failing to signal his movement into the left turn lane, he decided to issue him a warning.  [Filing No. 42-1 at 3.]  Officer Brooks told Officer Kehl he could leave the scene and proceeded to print Mr. Williams a warning ticket.  [Filing No. 42-1 at 3; Brooks Video at 1:22.]  After checking Mr. Williams' license plate and registration and printing out the warning ticket, all of which took about three minutes, Officer Brooks got out of his squad car to return to Mr. Williams' car.  [Brooks Video at 1:22 to 1:25.]

### B.  Mr. Williams Exits His Car and Gets Back In

As Officer Brooks exited his car and started to approach Mr. Williams' car, Mr. Williams abruptly began to exit his car.  [Filing No. 51-2 at 51; Brooks Video at 1:25.]  Officer Brooks had learned through his training that his position – away from his own car with no cover – was one of the most vulnerable positions for an officer to be in during a traffic stop.  [Filing No. 42-1 at 3; 51-2 at 51.]  Officer Brooks also had never encountered a person getting out of their car and leaving the scene during a traffic stop.  [Filing No. 42-1 at 3.]

Officer Brooks said "Hey, you need to stay in the car" and, when Mr. Williams kept exiting his car, Officer Brooks said "Get in your car."  [Brooks Video at 1:25.]  Mr. Williams kept walking away from his car, and Officer Brooks again said "Get in your car.  I'm not playing games with you.  Get in your car.  Get back in the car now."  [Brooks Video at 1:25.]  Mr. Williams did not get back in the car and stated that he was getting a paper towel to clean his side mirror.  [Brooks Video at 1:25; Filing No. 42-2 at 2.]  Officer Brooks said "Listen, get back in the car," and Mr. Williams said "Don't pick a fight with me, dude."  [Brooks Video at 1:25.]  Officer Brooks then

drew his taser and said "Get back in your car now or I will tase you," and Mr. Williams again said "Don't pick a fight with me," and started to get back in his car. [Brooks Video at 1:25.]

At that point, Officer Brooks radioed for Officer Kehl to return to the scene. [Brooks Video at 1:25.] Mr. Williams closed his car door and started to say to Officer Brooks "I understand what you're…." [Brooks Video at 1:25.] Officer Brook said "I don't care if you appreciate it. If I tell you get back in the car, you get back in the car. What is your deal? What's your deal?" and "why would you get out of the car on a traffic stop is what I'm asking you." [Brooks Video at 1:26.] Mr. Williams responded that he had a dirty mirror and wanted to clean it, and Officer Brooks again asked Mr. Williams if he had had anything to drink, to which Mr. Williams responded "no." [Brooks Video at 1:26.]

### C. Officer Brooks Orders Mr. Williams To Get Out of His Car for a Pat-down Search and Field Sobriety Test

Because Mr. Williams had exited his car and because of his demeanor, Officer Brooks believed he might be impaired and determined that he should perform a pat-down search and field sobriety test. [Filing No. 50-1 at 16-21.] Officer Brooks asked Mr. Williams if he minded stepping out of the car, Mr. Williams said something unintelligible, and Officer Brooks said "because I'm asking you to step out of your car." [Brooks Video at 1:26.] Mr. Williams then asked Officer Brooks if he had probable cause, and Officer Brooks responded "will you step out of the car?" [Brooks Video at 1:26.] Mr. Williams again asked if Officer Brooks had probable cause, and Officer Brooks said "I'm asking you to step out of the car right now. You need to listen. I can ask you to step out of the car in a traffic stop so get out of the car. Get out of the car. Get out of the car." [Brooks Video at 1:26.] Mr. Williams said something and Officer Brooks responded "because I want to run you through field sobriety because apparently you're not getting what's going on." [Brooks Video at 1:26.]

Mr. Williams then got out of the car, and was facing Officer Brooks.  Officer Brooks said "face that way for me," pointing for Mr. Williams to face toward his own car.  [Brooks Video at 1:26.]  Mr. Williams took a step toward Officer Brooks and said he should give him a breathalyzer.  [Brooks Video at 1:26.]  Officer Brooks again said "face that way for me," then "turn around," and grabbed Mr. Williams' right arm and pushed him toward his car.  [Brooks Video at 1:26.]  Mr. Williams said something unintelligible, and Officer Brooks said "I'm not playing with you."  [Brooks Video at 1:26.]  Mr. Williams pushed against the car with his left hand, back toward Officer Brooks, and said "if you're going to do this, you're going to visit with my attorney, son."  [Brooks Video at 1:26.]  Officer Brooks said "listen" and "quit resisting," and Mr. Williams said "I'm not resisting," but again pushed against the car with his left hand back toward Officer Brooks.  [Brooks Video at 1:27.]

Officer Brooks then radioed asking Officer Kehl to "step it up a little bit."  [Brooks Video at 1:27.]  At that point, Officer Brooks was trying to get both of Mr. Williams' hands behind his back, and Mr. Williams was pushing back against Officer Brooks, causing them both to move back away from the car.  [Brooks Video at 1:27.]  Officer Brooks pushed Mr. Williams into the side of his car.  [Brooks Video at 1:27.]  Mr. Williams then spun to the right, so he was facing Officer Brooks, and Officer Brooks lost his grip on Mr. Williams' left arm and eventually on both arms so that Mr. Williams was then facing Officer Brooks.  [Brooks Video at 1:27.]  Mr. Williams took a step toward Officer Brooks, and twice Officer Brooks told Mr. Williams to "turn around."  [Brooks Video at 1:27.]  Mr. Williams said "are you on video by the way?," and Officer Brooks responded "yes, I'm on video."  [Brooks Video at 1:27.]  Mr. Williams shrugged his shoulders, and Officer Brooks said "Turn around.  Turn around.  Put your hands above your head."  [Brooks Video at 1:27.]  Rather than turning to face his vehicle, Mr. Williams made a 360 degree turn, so

he was still facing Officer Brooks.  [Brooks Video at 1:27.]  Mr. Williams briefly put his hands above his head and said "what do you want from me?"  [Brooks Video at 1:27.]

### D.  Officer Kehl Returns to the Scene

Officer Kehl then arrived back at the scene.  [Brooks Video at 1:27.]  He ordered Mr. Williams to turn around three times then, when Mr. Williams did not, grabbed Mr. Williams and turned him so he was facing his car.  [Brooks Video at 1:27.]  Officer Kehl ordered Mr. Williams twice to put his hands behind his back, then pulled Mr. Williams' hands behind his back when Mr. Williams did not comply.  [Brooks Video at 1:27.]  Officer Kehl then handcuffed Mr. Williams. [Brooks Video at 1:27.]  Mr. Williams said "Guys, this is gonna be really bad.  You're going to put me in handcuffs?  For what?  This is gonna be a really bad video for you guys."  [Brooks Video at 1:27.]  Officer Kehl said "I just saw what you did to him. That's assault on a police officer." [Brooks Video at 1:27.]  Mr. Williams denied that it was assault on a police officer.  [Brooks Video at 1:27.]

Officer Brooks then proceeded to pat Mr. Williams down, and asked him again if he had had anything to drink that night.  [Brooks Video at 1:28.]  Mr. Williams said "I've told you no several times.  Why do you keep asking me?"  [Brooks Video at 1:28.]  Officer Brooks responded "because normal people that haven't been drinking don't act like you're acting right now." [Brooks Video at 1:28.] Mr. Williams said "Look, I've had a very long day.  I was up since 6 a.m. this morning, I had meetings beginning early, and I had meetings running late."  [Brooks Video at 1:28.]  Officer Brooks walked Mr. Williams to his squad car and placed him in the back seat. [Brooks Video at 1:28.]  Mr. Williams said "this is gonna be really bad on your report, son" to Officer Brooks.  [Brooks Video at 1:28.]  At that point, Officer David Lindenschmidt arrived at the scene.  [Brooks Video at 1:28; Lindenschmidt Video at 1:28.]  Mr. Williams said "this is

uncomfortable on my wrists," and Officer Kehl said "it's not supposed to be comfortable, okay." [Brooks Video at 1:29.]  Officer Brooks said "we'll be with you in a second," and Mr. Williams said "you guys are about to head into deep water."  [Brooks Video at 1:29.]

### E.  Witness Joshua Jones Observes the Altercation

Joshua Jones was working at the gas station the evening of October 5, 2011, observed the traffic stop, and completed a Voluntary Statement Form that evening in which he stated:

> It appeared that the officer was trying to get the driver to cooperate and the driver was not cooperating.  The officer attempted to restrain the driver.  It appeared the driver swung an elbow at the officer.  That was when 2 other officers arrived on the scene and where [sic] able to cuff the driver.

[Filing No. 42-11.]

### F.  Sergeant Trump Arrives at the Scene

Shortly after Officer Brooks placed Mr. Williams in his squad car, Sergeant Shannon Trump, the shift supervisor that evening, came to the scene and spoke to Mr. Williams while he was in the back seat of Officer Brooks' squad car.  [Brooks Video at 1:34; Filing No. 42-9 at 2.] Sergeant Trump has been employed by the Noblesville Police Department as a law enforcement officer since 2002, attended the ILEA, and has received the training required by the State of Indiana for her position as a police officer.  [Filing No. 42-9 at 1.]

Mr. Williams asked Sergeant Trump if he could meet with the Chief of the Noblesville Police Department in the morning, and said that Officer Brooks was "very hostile and aggressive," that he did not know why Officer Brooks had pulled him over, that he complied with everything Officer Brooks asked of him, that Officer Brooks wanted to do a field sobriety test, and that he had asked whether Officer Brooks had probable cause to administer the test.  [Brooks Video at 1:34.]  Sergeant Trump told Mr. Williams they did not need probable cause to do a field sobriety test.  [Brooks Video at 1:34.]  Mr. Williams told Sergeant Trump that Officer Brooks "got

aggressive" with him "slammed [him] against the car," put him in handcuffs, and that he understood how these things worked because he had several friends who were state troopers. [Brooks Video at 1:34-1:35.] He said "I understand the job, and I respect it, and I appreciate it." [Brooks Video at 1:35.] Mr. Williams said he had no disrespect for the officers involved but that "I think you've got an officer who's a little bit over-aggressive, and probably needs to be reined in a little bit." [Brooks Video at 1:35.] Mr. Williams stated that he was a business owner and had several people that were depending on him being in the office the next day. [Brooks Video at 1:35.] He said "sitting here is extraordinarily inappropriate," especially in handcuffs that were hurting his wrists. [Brooks Video at 1:35.] Mr. Williams said he would "be happy to" take a field sobriety test or submit to a breathalyzer, but that "for some reason [Officer Brooks] decided to slam [him] against the car and put [him] in handcuffs." [Brooks Video at 1:35.] Mr. Williams again stated that it was inappropriate, and that the video and audio tape would support that. [Brooks Video at 1:35.] When Sergeant Trump asked Mr. Williams if Officer Brooks had told him not to walk away from his car but he did walk away, Mr. Williams said that Officer Brooks was giving him contradictory messages by telling him first to stay in the car, then to get out of the car. [Brooks Video at 1:36.] Mr. Williams explained that he noticed his side mirror was dirty, so he had decided to go get a paper towel and wipe it off. [Brooks Video at 1:36.] When Sergeant Trump said to Mr. Williams that, especially since he has friends in law enforcement, he must understand that when an officer tells him to do something during a traffic stop, he must do it unless it is unlawful, Mr. Williams responded "nothing I did threatened him in any way." [Brooks Video at 1:36.] Mr. Williams then said he was "compliant," but that Officer Brooks was "overly hostile and aggressive." [Brooks Video at 1:36-1:37.] Mr. Williams again said that it was "extraordinarily inappropriate" for him to be sitting in the squad car with handcuffs, and again stated that the

handcuffs were hurting him. [Brooks Video at 1:37.] He asked Sergeant Trump to take the handcuffs off and, when she said no, asked her to repeat it to "make sure we have that on tape." He then again consented to a field sobriety test. [Brooks Video at 1:37.]

### G. Field Sobriety and Breathalyzer Tests

Shortly thereafter, Officer Brooks removed Mr. Williams from the squad car. [Brooks Video at 1:46.] Mr. Williams told Officer Brooks "you guys don't know who I am and you don't know what I do, but this is gonna end badly – and not badly for me." [Brooks Video at 1:46.] Officer Brooks then explained to Mr. Williams that he was going to administer a field sobriety test. [Brooks Video at 1:46.] Officer Lindenschmidt was also present during the field sobriety test. [Filing No. 42-9 at 2; *see also* Brooks Video at 1:46.] During the field sobriety test, Mr. Williams stated that he was "getting tired of this game." [Brooks Video at 1:48.] When Officer Brooks instructed Mr. Williams to follow the tip of a pen without moving his head, and using only his eyes, Mr. Williams refused to follow the instruction and moved his head from side to side. [Brooks Video at 1:48.] As a result, Officer Brooks terminated the field sobriety test. [Brooks Video at 1:48.] Mr. Williams consented to a breathalyzer, [Brooks Video at 1:50], which registered a 0% reading for blood-alcohol level.

### H. Mr. Williams is Arrested and Charged

Officer Brooks then advised Mr. Williams that he was being arrested for resisting a police officer, [Lindenschmidt Video at 2:00], and transported him to Hamilton County Jail. The Hamilton County Prosecutor's Office charged Mr. Williams with resisting law enforcement and battery. [Filing No. 42-13 at 2.] On March 6, 2012, Mr. Williams signed a Pretrial Diversion Agreement, acknowledging that he was "admitting the truthfulness of the charges against him" and "that such admission may be used against him…if there is a resumption of the prosecution of

these charges by reason of termination from the pretrial diversion program." [Filing No. 42-12 at 2.] The Pretrial Diversion Agreement included, among other things, a condition that Mr. Williams complete anger management treatment. [Filing No. 42-12 at 3.] Because Mr. Williams did not comply with the anger management treatment condition, the Pretrial Diversion Agreement was terminated. [Filing No. 42-13 at 2.]

### I. Mr. Williams' State Court Trial

In April 2012, a bench trial was held regarding the charges against Mr. Williams. [*See* Filing No. 50-2.] The Hamilton County Prosecutor's Office dropped the battery charge against Mr. Williams, based at least in part on Officer Brooks' statements to the prosecutor that Mr. Williams did not commit battery against him during the traffic stop. [*See* Filing No. 42-13 at 2.] At the conclusion of the bench trial, the State Court Judge dismissed the resisting law enforcement charge upon Mr. Williams' motion to dismiss. [Filing No. 50-2 at 51-53.]

### J. The Lawsuit

On October 4, 2013, Mr. Williams filed the instant lawsuit against Officer Brooks, Officer Kehl, and Sergeant Trump, all in their individual capacities. [Filing No. 1.] Mr. Williams asserted the following claims: (1) violation of the Fourth Amendment[2] for use of excessive force under 42 U.S.C. § 1983 against Officer Brooks related to pulling Mr. Williams over, grabbing his arm, "repeatedly forc[ing] him against his vehicle," "forcibly ramm[ing his] body into the driver's side mirror while forcing both of his hands into Mr. Williams' back, inflicting ongoing pain and physical injuries," and threatening Mr. Williams with a weapon, [Filing No. 1 at 11-12]; (2) violation of the Fourth Amendment under 42 U.S.C. § 1983 against Officer Brooks for unlawful

---

[2] Mr. Williams also brings his claims under the Fourteenth Amendment. The Fourteenth Amendment's due process clause is the vehicle by which the Fourth Amendment is applicable to the states. *Wolf v. Colorado*, 338 U.S. 25, 27-28, 69 S.Ct. 1359, 93 L.Ed.2d 1782 (1949).

stop and arrest, for pulling him over when he "did not commit any traffic infraction justifying the initiation of the stop," [Filing No. 1 at 12-13]; (3) violation of the Fourth Amendment under 42 U.S.C. § 1983 against Officer Kehl for unlawful stop and arrest for "[knowing] that Officer Brooks did not have a sufficient basis to stop Mr. Williams' vehicle," "assault[ing] Mr. Williams," and "plac[ing] Mr. Williams in handcuffs while Officer Brooks held a weapon pointed at Mr. Williams," [Filing No. 1 at 13-14]; (4) violation of the Fourth Amendment under 42 U.S.C. § 1983 against Officer Kehl for failure to protect Mr. Williams by "falsely claim[ing] that he observed 'fighting' between Officer Brooks and Mr. Williams while he was approaching the scene in a moving vehicle and while he had an obstructed view," and "fail[ing] to take reasonable steps to prevent harm from occurring to Mr. Williams," [Filing No. 1 at 14-15]; and (5) violation of the Fourth Amendment under 42 U.S.C. § 1983 against Sergeant Trump for failure to protect Mr. Williams and supervise Officer Brooks, [Filing No. 1 at 15-17].[3] Defendants now move for summary judgment. [Filing No. 40.]

### III.
#### DISCUSSION

Defendants move for summary judgment on all of Mr. Williams' claims. Mr. Williams opposes and, in doing so, relies upon the findings of the state court judge in his criminal trial to argue, among other things, that he did not resist law enforcement. [*See, e.g.*, Filing No. 49 at 3-4.] The Court notes at the outset that the state court judge was considering whether the State had proven the charges against Mr. Williams beyond a reasonable doubt, while this Court applies a very different standard, discussed below. This Court is not bound by the state court judge's findings, and will not give those findings any controlling or preclusive weight in this proceeding.

---

[3] Mr. Williams filed a Statement of Claims on October 30, 2014, which sets forth claims that are consistent with those asserted in the Complaint. [Filing No. 38.]

14

Defendants argue in support of their summary judgment motion that Mr. Williams' claims fail substantively because Defendants did not violate his constitutional rights, and that they are entitled to qualified immunity from Mr. Williams' claims in any event. The Court will address the issues in the order the parties have raised them.

**A. Unlawful Stop and Arrest Claims**

Mr. Williams alleges that Officer Brooks violated his Fourth Amendment rights by unlawfully stopping and arresting him because: (1) Officer Brooks initiated the stop to determine whether Mr. Williams was a drunk driver; (2) although Officer Brooks' stated purpose for stopping Mr. Williams was that Mr. Williams did not signal his lane change into the turn lane, "video from Officer Brooks' car clearly shows that Mr. Williams was stopped at a turn light and that Mr. Williams' turn signal was flashing when Officer Brooks pulled into the turn lane behind Mr. Williams' stopped car, before Officer Brooks activated his police lights to signal his presence"; and (3) Mr. Williams did not commit any traffic infraction justifying the traffic stop, but was "repeatedly threatened with a deadly weapon, repeatedly assaulted, injured, handcuffed and arrested." [Filing No. 1 at 12-13.] Mr. Williams also alleges that Officer Kehl violated his Fourth Amendment rights because he should have known Officer Brooks did not have a reasonable basis for stopping him or arresting him, and because Officer Kehl assaulted him while placing him in handcuffs. [Filing No. 1 at 13-14.]

Defendants argue in support of their Motion for Summary Judgment that there is evidence that Mr. Williams violated Indiana traffic statutes by failing to signal his movement into the left-turn lane. [Filing No. 41 at 13.] They assert that Officer Brooks had probable cause to initiate the traffic stop, and probable cause is an absolute defense to a false arrest claim under § 1983. [Filing No. 41 at 13-14.] Defendants note that Mr. Williams did not testify with certainty that he signaled

his movement into the left-lane, but only that this was his usual practice. [Filing No. 41 at 15.] Defendants also argue that it is not a violation of the Fourth Amendment to arrest an individual for even a very minor traffic offense, and that because Officer Brooks had probable cause to initiate the traffic stop, any charges arising from the same incident (including the resisting law enforcement charge) are constitutionally valid. [Filing No. 41 at 15-16.] In any event, Defendants argue, the evidence shows that Mr. Williams did in fact resist law enforcement by "resist[ing] [Officer] Brooks' efforts to turn him around and move him towards the car by 'stiffening up' and planting his feet," by "detach[ing] his wrist from [Officer] Brooks' grip before shoving [Officer] Brooks away," and by "'pulling away' from [Officer Brooks'] grasp which usually is enough to support a conviction." [Filing No. 41 at 19.] Defendants note that both Mr. Jones and Officer Kehl observed that Mr. Williams was not cooperating with Officer Brooks. [Filing No. 41 at 21.] Defendants also point to Mr. Williams' Pretrial Diversion Agreement, wherein he admitted to the charges against him, including resisting law enforcement. [Filing No. 41 at 23.] Finally, Defendants argue that Officers Brooks and Kehl are entitled to qualified immunity because there was probable cause to initiate the traffic stop and to arrest Mr. Williams for resisting law enforcement. [Filing No. 41 at 24-27.]

Mr. Williams responds that there was not probable cause to initiate the traffic stop because he did not commit a traffic violation since he "was pretty certain that his turn signal had been activated as that was his normal routine and practice to do so." [Filing No. 49 at 7.] Mr. Williams also argues that, in any event, he did not "change lanes," but rather "selected an additional lane of travel, the turn lane, for his eventual turn onto Greenfield Avenue." [Filing No. 49 at 8.] He asserts that the Court cannot weigh or determine the credibility of evidence on summary judgment, and that the basis for the traffic stop is a question of fact that precludes summary judgment. [Filing

No. 49 at 9.]  Mr. Williams further argues that there was no probable cause to arrest him for resisting law enforcement because he did not flee, but merely "innocuously exited his vehicle and walked toward the gas station in order to obtain a paper towel to clean his side mirror," and complied with Officer Brooks' requests to re-enter his vehicle and then to exit his vehicle for a field sobriety test.  [Filing No. 49 at 10-11.]  Mr. Williams asserts that the basis for the traffic stop ended when he denied drinking alcohol, and so "Officer Brooks was not lawfully engaged in the execution of his duties as an officer at the time that he initiated the violent physical encounter and battery against Mr. Williams."  [Filing No. 49 at 11.]  Mr. Williams argues that he had the right to ignore Officer Brooks and "go about his business" because Officer Brooks lacked probable cause, but that he did in fact cooperate with Officer Brooks.  [Filing No. 49 at 13.]  Mr. Williams contends that his Pretrial Diversion Agreement is not admissible, and does not establish probable cause in any event.  [Filing No. 49 at 15-16.]

On reply, Defendants assert that the proper focus is whether Officer Brooks reasonably believed that Mr. Williams engaged in a moving violation, and that signaling as he entered the turn lane (which is what Mr. Williams testified he did) does not comply with the traffic statute, which requires signaling several feet before entering the turn lane.  [Filing No. 55 at 2.]  As for the resisting law enforcement arrest, Defendants reiterate their argument that, as long as there is "arguable" probable cause to support any charge, there is no Fourth Amendment violation, and here there was probable cause to support a charge for the traffic violation.  [Filing No. 55 at 3-4.]  Defendants point to the video evidence, which shows Mr. Williams failing to follow Officer Brooks' multiple instructions to roll down his window, return to his car, get out of his car, and turn around, and also video of Mr. Williams stiffening up and physically resisting Officer Brooks.  [Filing No. 55 at 6.]  Finally, Defendants argue that deposition testimony from the gas station

attendant, Mr. Jones, that he believed Officer Brooks used excessive force is irrelevant to the probable cause analysis.  [Filing No. 55 at 7.]

Mr. Williams brings his false arrest claim under 42 U.S.C. § 1983, which requires him to demonstrate: "(1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that the deprivation was visited upon [him] by a person or persons acting under color of state law." *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (quoting *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004) (quotation marks omitted)).  A roadside traffic stop constitutes a "seizure" under the Fourth Amendment. *Elliot v. Sheriff of Rush Co.*, 686 F.Supp.2d 840, 853 (S.D. Ind. 2010).  Police may make a traffic stop when they have probable cause to believe the driver has violated a traffic law, even a minor one. *United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).

In order to succeed on a false arrest claim under § 1983, Mr. Williams must show that he was arrested without probable cause. *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009); *Bugariu v. Town of St. John, Ind.*, 2014 WL 958025, *3 (N.D. Ind. 2014) ("The big question in a false arrest claim under…federal law is whether the defendant had probable cause for the arrest").  Probable cause is "an absolute defense to a wrongful arrest claim under [42 U.S.C. §] 1983." *Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014); *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 746 (7th Cir. 2003).

"Probable cause to make an arrest exists when a reasonable person confronted with the sum total of the facts known to the officer at the time of the arrest would conclude that the person arrested has committed, is committing, or is about to commit a crime." *Venson v. Altamirano*, 749 F.3d 641, 649 (7th Cir. 2014); *see also Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014)

("Probable cause exists when 'the facts and circumstances within [the officer's] knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense'"). Probable cause "is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). Courts "'step into the shoes of a reasonable person in the position of the officer,' considering the facts known to the officer at the time [but] do not consider the subjective motivations of the officer." *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012) (citations omitted).

### 1. *Officer Brooks*

#### a. Initial Traffic Stop

Officer Brooks initiated Mr. Williams' traffic stop because he believed Mr. Williams had violated Indiana Code § 9-21-8-25, which provides that:

> A signal of intention to turn right or left shall be given continuously during not less than the last two hundred (200) feet traveled by a vehicle before turning or changing lanes. A vehicle traveling in a speed zone of at least fifty (50) miles per hour shall give a signal continuously for not less than the last three hundred (300) feet traveled by the vehicle before turning or changing lanes.

Mr. Williams focuses on his testimony that he generally activated his turn signal when moving into turn lanes, so believes he did so on the evening that he was pulled over by Officer Brooks. [Filing No. 49 at 7-8.] But Mr. Williams' argument is fatally flawed, because whether he actually activated his turn signal is irrelevant to the probable cause analysis. All that matters is that Officer Brooks reasonably believed that Mr. Williams did not activate his turn signal, *Venson*, 749 F.3d at 649, and the Court finds that his belief was reasonable. Officer Brooks consistently testified, and stated in the police report, that he observed Mr. Williams move from the outside lane

to the left turn lane without activating his turn signal.  [*See, e.g.*, Filing No. 42-1 at 2; Filing No. 42-2 at 1; Filing No. 50-1 at 5.]

Mr. Williams has not presented any evidence which would indicate that Officer Brooks' belief that Mr. Williams had not activated his turn signal was not reasonable.  Indeed, Mr. Williams' only real argument to dispute that there was probable cause for the traffic stop is that he routinely signals when he switches into a turn lane, so believes he would have done so the evening of the traffic stop.  [*See, e.g.*, Filing No. 49 at 7-8.]  Again, whether Mr. Williams actually activated his turn signal is irrelevant, and his general statements about his usual routine do not call into question the reasonableness of Officer Brooks' belief.  *See Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1114 (7th Cir. 2013) (finding officer had probable cause for traffic stop and noting "[plaintiff] denies that he was speeding because he was always careful to obey the speed limit when driving on that stretch of road – but this assertion, on its own, does nothing to rebut the fact that [the police officer] reasonably believed [plaintiff] was speeding, or to put into question the accuracy of the radar gun…."); *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) (stating that in determining whether there was probable cause for traffic stop, "we need only inquire whether the officer had probable cause to believe that a traffic violation occurred…not whether [the driver] actually was tailgating") (internal citation omitted).  The Court finds that Officer Brooks had probable cause to pull Mr. Williams over for failing to activate his turn signal when switching into the left-hand turn lane.[4]

---

[4] Mr. Williams also argues that even if he did not activate his turn signal to move into the left-hand turn lane, this conduct did not violate Indiana statute in any event, so Officer Brooks did not have probable cause to pull him over.  [Filing No. 49 at 8 ("Regardless, Mr. Williams did not 'change' lanes, as there were no lane markings which distinguish the inception of the turn lane, but rather selected an additional lane of travel, the turn lane, for his eventual turn onto Greenfield Avenue").] But even if Mr. Williams' interpretation of the Indiana traffic statute is correct, and Officer Brooks was mistaken regarding whether Mr. Williams' actions actually violated a law, there was still

b.  Arrest for Resisting Law  Enforcement

Mr. Williams also claims that Officer Brooks violated his Fourth Amendment rights by arresting him for resisting law enforcement without probable cause.  Having found that Officer Brooks had probable cause to conduct the traffic stop, it follows that Officer Brooks had probable cause to arrest Mr. Williams without violating his Fourth Amendment rights – even for resisting law enforcement.  *See United States v. Childs*, 277 F.3d 947, 953 (7th Cir. 2002) ("A person arrested for an offense punishable only by a fine typically is given a citation (a 'ticket') and released, but *Atwater* [*v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001)] holds that the Constitution allows the police to place the person in custody and take him to be booked"); *Jones*, 737 F.3d at 1115 ("Once Officer Snyder had probable cause to conduct the traffic stop of Jones for speeding, he could arrest Jones without violating his Fourth Amendment rights…Thus, we need not address whether Officers Snyder and Moore also had probable cause to arrest Jones for OWI-refusal or OWI-endangerment"); *Mudd v. Lyon*, 2014 WL 218443, *7 (N.D. Ind. 2014) ("plaintiff could have been arrested for the traffic offenses discussed above [including Ind. Code § 9-21-8-25]….Because defendants could have arrested plaintiff for the traffic offenses without violating his Fourth Amendment rights, plaintiff's Fourth Amendment rights were not violated when he was arrested [for operating while intoxicated], and the court need not engage in a detailed probable cause analysis with regard to plaintiff's alleged violation of the Indiana OWI law").

---

probable cause to initiate the traffic stop because the Court finds that such a mistake would have been reasonable.  *See Heien v. North Carolina*, 135 S. Ct. 530, 539-40 (2014) (officer had probable cause to initiate traffic stop where vehicle had only one working brake light and officer believed this constituted a violation of North Carolina statute, but statute actually only required one working brake light).

In any event, the Court finds that Officer Brooks had probable cause to believe that Mr. Williams committed the crime of resisting law enforcement. Mr. Williams initially ignored Officer Brooks' six commands to get back in his car. He only acquiesced after a seventh command and a threat that Officer Brooks would tase him if he did not return to his car. When Mr. Williams finally returned to his car, then exited his car after Officer Brooks asked him repeatedly to get out, Mr. Williams was uncooperative and would not turn around so that Officer Brooks could handcuff him and pat him down. He ignored commands from Officer Brooks to either face toward his car or turn around. When Officer Brooks attempted to handcuff him, Mr. Williams would not let him do so, spun around, broke free of Officer Brooks' grip, and took a step toward Officer Brooks. The video clearly shows Mr. Williams pushing against his car and back toward Officer Brooks, so that his body is pushing back against Officer Brooks. Officer Brooks – significantly smaller than Mr. Williams[5] – was unable to gain control of Mr. Williams so that he could handcuff him. Mr. Williams then ignored three more commands from Officer Brooks to turn around. Mr. Williams' repeated refusal to comply with Officer Brooks' commands to turn around or face his car, his refusal to be handcuffed, and his pushing against his car into Officer Brooks so that Officer Brooks could not gain control gave Officer Brooks probable cause to believe that Mr. Williams was resisting arrest. *See* IC § 35-44.1-3-1 ("A person who knowingly or intentionally: (1) forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties…commits resisting law enforcement"); *Draper v. Reynolds*, 369 F.3d 1270, 1276-77 (11th Cir. 2004) (police officer had "ample probable cause" to arrest individual for resisting law enforcement where he had pulled

_____

[5] Officer Brooks was 5'9" and 170 pounds at the time of the incident, [Filing No. 42-1 at 4], and Mr. Williams was 6'3" and 195 pounds, [Filing No. 42-5 at 2].

individual over for taillight violation and individual "repeatedly refus[ed] to comply with [the officer's] reasonable instructions, and…act[ed] belligerently and confrontationally").  Officer Brooks is entitled to judgment as a matter of law as to Mr. Williams' claims of unlawful stop and arrest.

### 2. *Officer Kehl*

Mr. Williams alleges that Officer Kehl violated his Fourth Amendment rights by unlawfully stopping and arresting him because he knew or should have known that Officer Brooks did not have a sufficient basis to stop or arrest him, and because Officer Kehl assaulted Mr. Williams while placing him in handcuffs.  [Filing No. 1 at 13-14.]  The parties do not address Mr. Williams' claim against Officer Kehl for unlawful stop and arrest, but the Court will consider whether Officer Kehl is entitled to summary judgment on that claim based on the same arguments Defendants make in connection with that claim as asserted against Officer Brooks.  *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280 (7th Cir. 1986) (holding that where one defendant files a motion that is equally effective in barring the claim against the other defendants, the Court may *sua sponte* enter judgment in favor of the additional non-moving defendant if the plaintiff had an adequate opportunity to argue in opposition to the motion).

In his unlawful stop and arrest claim against Officer Kehl, Mr. Williams alleges that Officer Kehl "knew or should have known that Officer Brooks did not have a sufficient basis to stop Mr. Williams' vehicle," and also that Officer Kehl "assaulted Mr. Williams, who was standing with his hands in the air when Officer Kehl arrived, and placed Mr. Williams in handcuffs while Officer Brooks held a weapon pointed at Mr. Williams," and "knew or should have known that he and Officer Brooks did not have a sufficient basis to arrest Mr. Williams."  [Filing No. 1 at 14.]  The Court considers each theory in turn.

a.  <u>Initial Traffic Stop</u>

Although Mr. Williams alleges that Officer Kehl somehow knew or should have known that Officer Brooks did not have a sufficient basis to stop Mr. Williams for a traffic violation, it is undisputed that Officer Kehl was not present when Officer Brooks observed Mr. Williams moving into the turn lane on State Road 37, but rather arrived at the scene as Officer Brooks was pulling Mr. Williams over in the gas station parking lot.  [*See, e.g.*, Filing No. 42-7 at 1.]  Moreover, as discussed above, the Court has already found that Officer Brooks did in fact have probable cause to make the traffic stop.  Accordingly, Mr. Williams' claim that Officer Kehl violated his constitutional rights because he should have known that Officer Brooks had no basis to pull him over fails as a matter of law.

b.  <u>Officer Kehl's Handcuffing of Mr. Williams</u>

Mr. Williams claims that Officer Kehl violated his constitutional rights by handcuffing him.  The parties dispute whether Mr. Williams was resisting Officer Brooks' efforts to handcuff him and pat him down, but what is relevant is whether Officer Kehl's perception of the situation was reasonable.  *Venson*, 749 F.3d at 649.  Officer Kehl had initially left the scene after Officer Brooks told him he could do so.  [Filing No. 42-1 at 3.]  When Mr. Williams exited his car while Officer Brooks was approaching him to give him the warning ticket, Officer Brooks radioed for Officer Kehl to return to the scene.  [Brooks Video at 1:25.]  Shortly thereafter, Officer Brooks radioed for Officer Kehl to "step it up a little bit."  [Filing No. 42-7 at 2; Brooks Video at 1:27.]  Officer Kehl "could hear from [Officer Brooks'] voice that he was stressed," and "engaged [his] lights and siren."  [Filing No. 42-7 at 2.]  Upon arriving at the scene, Officer Kehl observed Officer Brooks and Mr. Williams engaged in a struggle, and "saw Mr. Williams throw an elbow at Officer

Brooks." [Filing No. 42-7 at 2.][6] Officer Kehl approached Mr. Williams, Mr. Williams ignored Officer Kehl's three commands to turn around, and Officer Kehl then proceeded to handcuff him. [Filing No. 42-7 at 2.]

The Court again notes that probable cause is an absolute defense to a claim of unlawful arrest under § 1983, *Rooni*, 742 F.3d at 740, and finds that Officer Kehl had probable cause to handcuff Mr. Williams, based on his reasonable belief that Mr. Williams was resisting Officer Brooks' efforts to handcuff him. This reasonable belief was based on Officer Brooks' request that he return to the scene and "step it up a little bit," and on Officer Kehl's observation when he arrived at the scene that Mr. Williams and Officer Brooks were struggling, and that Mr. Williams threw an elbow at Officer Brooks. Whether or not Mr. Williams actually threw an elbow at Officer Brooks, or actually assaulted Officer Brooks (Officer Brooks testified later that he did not), is irrelevant. A reasonable person in Officer Kehl's position could have concluded that Mr. Williams was resisting and needed to be handcuffed. Any claim that Officer Kehl violated Mr. Williams' constitutional rights by handcuffing him fails as a matter of law.

### c. Arrest for Resisting Law Enforcement

Any claim that Officer Kehl should have known Officer Brooks did not have a sufficient basis to arrest him for resisting law enforcement fails because the Court has already concluded that Officer Brooks had probable cause for making that arrest.

### 3. *Qualified Immunity*

In any event, Defendants argue, Officer Brooks is entitled to qualified immunity. To determine whether a defendant is entitled to qualified immunity, courts must address two issues:

---

[6] Officer Kehl's observation that Mr. Williams threw an elbow at Officer Brooks is consistent with Mr. Jones' initial account, who wrote in his Voluntary Statement Form that "[i]t appeared the driver swung an elbow at the officer." [Filing No. 42-11.]

"(1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation."  *Rooni*, 742 F.3d at 742 (citation omitted).  "In other words, the plaintiff must show not only that [his] constitutional rights were violated, but that any reasonable official under the circumstances would have realized that [his] rights were being violated."  *Easterling v. Pollard*, 528 Fed. Appx. 653, 656-57 (7th Cir. 2013). "To be clearly established at the time of the challenged conduct, the right's contours must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right,' and 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (quoting *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012)).

The Court has already concluded that Officer Brooks did not violate Mr. Williams' constitutional rights by initiating the traffic stop or by arresting him for resisting law enforcement, because Officer Brooks had probable cause for both actions.  Accordingly, because there has been no violation of constitutional rights, the Court need not consider Officer Brooks' additional defense that he is entitled to qualified immunity.  *Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1057-58 (7th Cir. 2011) (when there is no constitutional violation, defendants "do not require the additional protection of qualified immunity").  The Court notes, however, that even if there was not actual probable cause to pull over and arrest Mr. Williams – although the Court holds that there was – there was at least "arguable probable cause" such that Officer Brooks could be entitled to qualified immunity from Mr. Williams' unlawful stop and arrest claim.  *See Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013) ("qualified immunity provides shelter for officers who have

'arguable probable cause' to arrest – i.e., those officers that reasonably but mistakenly believe they have probable cause").[7]

In sum, Officers Brooks and Kehl acted with probable cause, and Mr. Williams' claims against them for unlawful stop and arrest (Counts II and III) fail as a matter of law.

### B. Excessive Force

Mr. Williams asserts a claim of excessive force under 42 U.S.C. § 1983 against Officer Brooks. [Filing No. 1 at 11-12.] Mr. Williams alleges that Officer Brooks grabbed his right arm, "repeatedly forced him against his vehicle," "forcibly rammed [his] body into the driver's side mirror while forcing both of his hands into [his] back," and "repeatedly threatened Mr. Williams with a weapon during the incident." [Filing No. 1 at 12.]

Defendants argue in support of their motion that the act of pushing Mr. Williams against his car was not excessive, that Officer Brooks did not use a taser on Mr. Williams but would have been justified in doing so, and that the circumstances indicate that Officer Brooks' use of force was reasonable. [Filing No. 41 at 29-30.] Defendants note that Mr. Williams posed an immediate threat to the safety of the officers on the scene, that Mr. Williams only returned to his car when Officer Brooks threatened to tase him, that Mr. Williams did not comply with Officer Brooks' requests for him to turn around so he could be handcuffed and patted down, that Mr. Williams was actively resisting arrest, and that Mr. Williams was larger than Officer Brooks. [Filing No. 41 at 30-31.] Although Mr. Williams does not assert an excessive force claim against Officer Kehl, Defendants argue that Officer Kehl's act of placing Mr. Williams in handcuffs was not excessive because he took actions to make sure the handcuffs were not too tight. [Filing No. 41 at 31.]

---

[7] The Court's statements regarding the application of qualified immunity to Officer Brooks' actions apply equally to the actions of Officer Kehl which – as the Court has discussed above – were also supported by probable cause or, at the very least, "arguable probable cause."

Finally, Defendants argue that Officer Brooks would be entitled to qualified immunity because the evidence shows that Mr. Williams was "putting up a sustained struggle" that necessitated the use of force, and "there are no cases in this circuit making it 'clearly established' that a few shoves against a suspect's car and subsequent handcuffing while that subject actively resists violates a person's constitutional rights." [Filing No. 41 at 32-33.]

Mr. Williams responds by arguing that he "calmly interacted" with Officer Brooks, did not pose an immediate threat to Officer Brooks' safety, and did not exhibit signs of being intoxicated. [Filing No. 49 at 16-17.] Mr. Williams argues that although Officer Brooks claims he intended to pat down Mr. Williams, Officer Brooks' actions show that he was attempting to injure and/or handcuff him. [Filing No. 49 at 17.] Mr. Williams points to Mr. Jones' deposition testimony that he found the actions of Officer Brooks and Officer Kehl to be excessive. [Filing No. 49 at 17-18.] Mr. Williams also contends that he did, in fact, assert an excessive force claim against Officer Kehl, and that Officer Kehl used excessive force when he "attacked Mr. Williams, shoved him into the vehicle, and then facilitated his arrest and physical detention." [Filing No. 49 at 18.]

Defendants reply that the video provides evidence that the force Officers Brooks and Kehl used was not excessive, and that Mr. Jones' opinion regarding whether that force was excessive is not relevant. [Filing No. 55 at 8.] Defendants note that Mr. Williams never received medical treatment for any back pain, does not take medication for it, and no injury would have occurred had he not resisted. [Filing No. 55 at 8.] Defendants assert that Mr. Williams has waived his excessive force claim against Officer Kehl. [Filing No. 55 at 8.]

A claim that an officer used excessive force in seizing an individual is "analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "[T]he test of reasonableness under the Fourth

Amendment is not capable of precise definition or mechanical application." *Id.* at 396 (citations and internal quotation marks omitted). Factors relevant to the inquiry include "'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (alterations in original) (quoting *Graham*, 490 U.S. at 396). "The dispositive question is whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner." *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) (citation and internal quotation marks omitted). This requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012) (quoting *Graham*, 490 U.S. at 396, 109 S. Ct. 1865) (internal quotation marks omitted).

An officer's use of force is "judg[ed] from the totality of the circumstances at the time of the [seizure]." *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (alterations in original) (citation and internal quotation marks omitted). In analyzing whether an officer's force was reasonable under the circumstances, the Court must "remain cognizant of 'the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" *Abbot v. Sangamon County, Ill.*, 705 F.3d 706, 724 (7th Cir. 2013) (quoting *Graham*, 490 U.S. at 397, 109 S.Ct. 1865). The Court must therefore give "considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." *Baird*, 576 F.3d at 342. "'[W]hen material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do *except* second-guess the

officers,'" therefore, "[i]n this situation…the reasonableness of the force used is a legal question." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (emphasis in original) (quoting *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)).

"Plaintiffs need not show physical injury in order to sustain an excessive force claim," as "an arrest can be effectuated by the slightest application of physical force, or by some other show of authority." *Baird*, 576 F.3d at 344 (citing *California v. Hodari D.*, 499 U.S. 621, 625, 111 S. Ct. 1547, 113 L.Ed.2d 690 (1991)). "The issue is simply whether, once it is clear…that a seizure has occurred, that seizure meets Fourth Amendment standards." *Baird*, 576 F.3d at 344.

In evaluating the conduct at issue here, the Court must "carve up the incident into segments and judge each on its own terms to see if the officer[s] w[ere] reasonable at each stage." *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999) (citation and quotation marks omitted). Therefore the Court must determine first whether "a seizure occurred," and if it did, whether "that seizure meets Fourth Amendment standards," *Baird*, 576 F.3d at 344, and whether the seizure violates clearly established law, *Miller*, 698 F.3d at 962. Although the parties do not discuss each seizure separately, the Court will do so and will consider each seizure for which Mr. Williams claims excessive force was used in chronological order, starting with Officer Brooks' actions during the traffic stop.

Additionally, the Court agrees with Defendants that Mr. Williams has not asserted a claim against Officer Kehl for excessive force.[8] He may not assert such a claim for the first time in

---

[8] In his Complaint, Mr. Williams only refers to Officer Brooks in connection with his excessive force claim. [*See* Filing No. 1 at 11-12 (mentioning only Officer Brooks in "Count I – Fourth Amendment Violation – Excessive Force").] Further he only addresses actions by Officer Brooks in his Statement of Claims relating to the excessive force claim. [Filing No. 38 at 3 (discussing only Officer Brooks in connection with "Count[] I: Fourth Amendment Violation – Excessive Force – Officer Brooks").] Mr. Williams cannot assert a claim that was not alleged in his Complaint for the first time in his response to the Motion for Summary Judgment – particularly

response to a motion for summary judgment. The Court will nevertheless address Officer Kehl's actions out of an abundance of caution.

### 1. *Officer Brooks' Threat To Tase Mr. Williams*

It is not clear whether Mr. Williams is alleging that Officer Brooks used excessive force when he threatened to tase him, but the Court will consider this to be the first seizure that is relevant to Mr. Williams' excessive force claim. The undisputed evidence shows that Mr. Williams began to exit his car when Officer Brooks had already exited his squad car and was walking toward Mr. Williams' car to give him a warning ticket. [Filing No. 51-2 at 51; Brooks Video at 1:25.] Officer Brooks testified that he had learned through his training that this position – away from his own car with no cover – was one of the most vulnerable positions an officer can be in during a traffic stop. [Filing No. 42-1 at 3; Filing No. 51-2 at 51.] Officer Brooks also testified that during his time as a police officer, no other person he has pulled over for a traffic violation has attempted to exit his or her car during the traffic stop. [Filing No. 42-1 at 3.]

Officer Brooks immediately told Mr. Williams to stay in his car, but Mr. Williams did not listen and continued to exit his car and walk away. [Brooks Video at 1:25.] Officer Brooks told Mr. Williams a total of seven times to get back in his car, and Officer Brooks did not comply. [Brooks Video at 1:25.] Only after giving Mr. Williams ample opportunity to comply did Officer

---

where he also did not address that claim in his Statement of Claims. *See Hancock v. Potter*, 531 F.3d 474, 480 (7th Cir. 2008) ("We decline to reach the substance of [plaintiff's] hostile work environment claim because she never alleged such a claim in her district court complaint. It was raised for the first time in her opposition to [defendant's] motion for summary judgment, and so it is not properly before this Court").

Brooks threaten to tase Mr. Williams.  [Brooks Video at 1:25.]  And only after being threatened with the taser did Mr. Williams return to his car.  [Brooks Video at 1:25.][9]

Mr. Williams attempts to paint a very different picture of the events that took place during the traffic stop, arguing that he was simply getting a paper towel from the gas station to clean his mirror, and that he "reentered his vehicle after Officer Brooks directed him to do so."  [Filing No. 49 at 17.]  But the video tells a very different story.  Mr. Williams – who was significantly larger than Officer Brooks – blatantly ignored seven separate commands to return to his car.  Mr. Williams' true motivation for exiting his car is irrelevant.  Instead, the Court must consider whether Officer Brooks behaved in an objectively reasonable manner in threatening to tase Mr. Williams.

The United States Supreme Court has instructed that, in the traffic stop context:

> It is…reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety….The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation….What we have said in these opinions probably reflects a societal expectation of "unquestioned [police] command" at odds with any notion that a passenger would feel free to leave, or to termination the personal encounter any other way, without advance permission.

Brendlin, 551 U.S. at 258 (citations and internal quotation marks omitted).  Additionally, the Seventh Circuit Court of Appeals has made clear that law enforcement may point their firearms at individuals "when there is a reasonable threat of danger or violence to police."  Baird, 576 F.3d at 346; see also United States v. Howard, 729 F.3d 655, 660 (7th Cir. 2013) (holding that it was reasonable under the Fourth Amendment for a police officer to order an individual to the ground

---

[9] "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission."  Brendlin v. California, 551 U.S. 249, 254, 127 S. Ct. 2400, 168 L.Ed.2d 132 (2007).  So, although Officer Brooks did not actually deploy the taser, the Court will consider his threat to tase Mr. Williams a seizure because Mr. Williams only returned to his car after Officer Brooks made that threat.

at gunpoint because the facts demonstrated that "the concern for officer safety was specific and strong," and noting that cases holding otherwise involve situations where the officers had no reason to believe the individual was "dangerous").

Given Officer Brooks' vulnerable position between the two cars, the fact that he did not know why Mr. Williams was exiting his car, the fact that Mr. Williams was significantly larger than him, and the fact that Mr. Williams ignored seven commands to get back in his car, the Court finds that Officer Brooks had legitimate reason to fear for his safety, and that his threat to use a taser on Mr. Williams was reasonable given the circumstances. *See Draper*, 369 F.3d at 1278 (not excessive force when officer actually deployed taser so that he could handcuff individual during traffic stop for obstructing law enforcement, where traffic stop was "difficult, tense and uncertain," and individual had refused to comply with officer's five requests to retrieve documents from his vehicle). Mr. Williams' claim of excessive force against Officer Brooks for threatening to tase him – to the extent he is asserting that claim – fails as a matter of law.

>    2. *Officer Brooks' Use of Force When Attempting a Pat-down Search of Mr. Williams*

The next seizure the Court identifies is Officer Brooks' use of force when attempting to conduct a pat-down search of Mr. Williams. Mr. Williams alleges that Officer Brooks used excessive force by pulling Mr. Williams, grabbing his arm, "repeatedly forc[ing] him against his vehicle," "forcibly ramm[ing his] body into the driver's side mirror while forcing both of his hands into Mr. Williams' back, [and] inflicting ongoing pain and physical injuries." [Filing No. 1 at 11-12.]

Again, the Court must consider whether Officer Brooks' actions were reasonable in light of the circumstances. Officer Brooks testified that when Mr. Williams finally got back in his car after seven commands to do so and after the threat of being tased, Officer Brooks asked him again

if he had been drinking because he had never seen someone exit their car during a traffic stop and thought maybe Mr. Williams had done so because he was intoxicated. [Filing No. 50-1 at 19; Brooks Video at 1:28.] Officer Brooks then determined that he should conduct a field sobriety test on Mr. Williams, given his unusual behavior. [Filing No. 50-1 at 17-19.] Accordingly, he ordered him to exit his car so that he could pat him down to make sure he was not carrying any weapons. [Brooks Video at 1:28.]

Mr. Williams again attempts to paint himself as a passive, compliant individual when he exited his car for the second time. [*See, e.g.*, Filing No. 49 at 17 (after he exited his vehicle to get a paper towel, Mr. Williams "reentered his vehicle after Officer Brooks directed him to do so"; "Mr. Williams then exited his vehicle after Officer Brooks ordered him out of the car"; Mr. Williams "reentered his vehicle at the officer's direction after the officer began yelling at him"; and after Mr. Williams exited his car, "Officer Brooks initiated a physical encounter with Mr. Williams and began battering him").][10] But the video contradicts Mr. Williams' characterization of his actions, and the Court bases its decision on the video evidence. *See Scott, 550 U.S. at 379-80*. Specifically, the video shows that:

- Officer Brooks asked Mr. Williams to exit his car six times before Mr. Williams finally did so;

- Officer Brooks asked Mr. Williams to turn around and face toward his car, but Mr. Williams instead took a step toward Officer Brooks;

- Officer Brooks told Mr. Williams to face toward his car and to turn around, then grabbed Mr. Williams' right arm to turn him toward his car when Mr. Williams would not turn around;

---

[10] In support of his argument that he did not resist, Mr. Williams states in his response brief that "Officer Lindenschmidt stated that Mr. Williams was 'very calm, very cool, very polite, very respectful.'" [Filing No. 49 at 18.] This is misleading at best, as Officer Lindenschmidt did not interact with Mr. Williams until after Mr. Williams was handcuffed and in the back seat of Officer Brooks' squad car. [Filing No. 52-2 at 6-7.]

- Officer Brooks pushed Mr. Williams up against the car, but Mr. Williams pushed against the car with his left hand, causing his body to go back into Officer Brooks;

- Mr. Williams continued to push against the car with his left hand, so that his body went back into Officer Brooks;

- Mr. Williams pushed back several times, then spun around to the right so he was facing Officer Brooks, which caused Officer Brooks to lose his grip on Mr. Williams' left arm and eventually on both arms; and

- Officer Kehl then arrived and handcuffed Mr. Williams.

Considering the three factors set forth by the Seventh Circuit Court of Appeals – the severity of the crime, whether there is an immediate threat to the officer's safety, and whether the plaintiff was actively resisting – the Court finds that, based on the video evidence, Officer Brooks' use of force against Mr. Williams was reasonable and not greater than necessary.  First, although it ultimately turned out not to be the case, Officer Brooks reasonably suspected that Mr. Williams was impaired given that Mr. Williams had abruptly exited his car while Officer Brooks was approaching to give him his warning ticket, and given that Officer Brooks had never experienced an individual exiting their car without permission during a traffic stop.  Officer Brooks' use of force was designed to pat Mr. Williams down and administer a field sobriety test, given Officer Brooks' reasonable suspicion.

Second, Officer Brooks testified that he felt threatened when Mr. Williams exited his car on Officer Brooks' command but failed to turn around and face his car.  This perception of a threat was reasonable because Officer Brooks had not yet patted Mr. Williams down, and did not know whether he had a weapon.  Additionally, Mr. Williams was larger than Officer Brooks.

Third, the video indicates that Mr. Williams was physically resisting.  Aside from failing to follow several commands to face his car or turn around, Mr. Williams forcibly resisted Officer Brooks' efforts to handcuff him by pushing back with his hand on his car, pushing his body into

Officer Brooks' body, and eventually breaking free of Officer Brooks' grip. Simply because he was not trying to strike Officer Brooks or flee the scene does not mean that he was not resisting.

Finally, while Mr. Williams now complains that he was injured when Officer Brooks pushed him into the side of his car, [*see, e.g.*, Filing No. 49 at 5], Mr. Williams did not complain of any injury at the scene, which again points to the reasonableness of Officer Brooks' actions. *See Sow v. Fortville Police Dept.*, 2010 WL 1490370, *6 (S.D. Ind. 2010)* ("Plaintiff did not complain to any officer about bumping his head. Nor did he complain to jail officials of any such injury or receive medical treatment for the same. Thus, while 'the officers' tactics in placing [Plaintiff] in the police car may have been clumsy or imprudent, [] they were not objectively unreasonable'") (quoting *Brant v. Volkert*, 72 Fed. Appx. 463, 466 (7th Cir. 2003)).

The Court finds that Officer Brooks' use of force during the struggle with Mr. Williams was reasonable given the circumstances reflected on the video,[11] and that no reasonable jury could find otherwise.[12] His excessive force claim against Officer Brooks fails as a matter of law.[13]

_____

[11] Mr. Williams makes much of Mr. Jones' deposition testimony that he thought Officer Brooks used excessive force. [Filing No. 53-5 at 18.] But Mr. Jones' lay opinion is irrelevant to the issue and thus inadmissible, as the reasonableness of force is judged from the perspective of a reasonable police officer in Officer Brooks' position, and not from Mr. Jones' perspective.

[12] To the extent Mr. Williams' excessive force claim relates to Officer Brooks pointing his taser at Mr. Williams at this point as well, the Court also finds that use of force to be reasonable. Mr. Williams was not heeding verbal commands, and the threat of being tased had caused him to return to his car when he initially exited. It was reasonable for Officer Brooks to again point his taser at Mr. Williams to try to get him to turn around so that he could handcuff him and pat him down before administering a field sobriety test.

[13] While it is true that "injury is not required to set out a claim for excessive force," a lack of injury can also "tend[] to suggest that there was not excessive force." *Ferrell v. Bieker*, 2006 WL 287173, *10 (N.D. Ind. 2006)* (citing *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 471 n.3 (7th Cir. 1997)). Here, Mr. Williams admits that he did not seek treatment for any injuries resulting from the use of force during his traffic stop and has never taken any medication for any injuries, [Filing No. 42-5 at 12-13], which further supports the Court's conclusion that excessive force was not, in fact, used.

### 3. Officer Kehl's Interactions With Mr. Williams

As the Court noted, Mr. Williams has not made an excessive force claim against Officer Kehl. Even if he had, however, the claim would fail. Mr. Williams claims that Officer Kehl "attacked" him, shoved him into his car, and "facilitated his arrest and physical detention." [Filing No. 49 at 18.] As discussed above, Officer Brooks had radioed for Officer Kehl to come back to the scene, then had radioed a second time asking Officer Kehl to "step it up a little bit." [Brooks Video at 1:25, 1:27.] Officer Kehl testified that he could sense urgency in Officer Brooks' voice, and that he activated his lights and siren to return to the scene. [Filing No. 42-7 at 2.] When he arrived, Officer Kehl observed Officer Brooks and Mr. Williams struggling, and Mr. Williams throwing an elbow at Officer Brooks.[14] The video shows that Officer Kehl ordered Mr. Williams to turn around three times, but Mr. Williams did not comply. [Brooks Video at 1:27.] When Officer Kehl grabbed Mr. Williams and turned him so he was facing his car, Officer Kehl twice ordered him to put his hands behind his back. [Brooks Video at 1:27.] When Mr. Williams did not comply, Officer Kehl grabbed his hands, pulled them behind his back, and handcuffed him. [Brooks Video at 1:27.] The force Officer Kehl used to turn Mr. Williams around and handcuff him was reasonable, given that Officer Kehl saw Officer Brooks and Mr. Williams struggling, saw Mr. Williams throw an elbow at Officer Brooks, and that Mr. Williams did not respond to Officer Kehl's commands to turn around and to put his hands behind his back.

To the extent that Mr. Williams bases an excessive force claim against Officer Kehl on his handcuffs being too tight, the video indicates that Mr. Williams complained to Officer Kehl one

---

[14] Officer Kehl's dashboard camera did not capture Officer Brooks and Mr. Williams right when Officer Kehl arrived back at the scene, because of the angle of Officer Kehl's police car when he pulled into the gas station parking lot. [Kehl Video at 1:27.]

time that the handcuffs were "uncomfortable on my wrists." [Brooks Video at 1:29.] This complaint is not enough to support an excessive force claim, especially in light of Officer Kehl's undisputed testimony that "as a matter of course I place two fingers on any subject['s] wrist before double locking the cuffs. Double locking assures that the handcuffs do not close any tighter while on the subject." [Filing No. 42-7 at 2.] *See* *Rabin*, 725 F.3d at 636 (officers entitled to qualified immunity where there was no evidence that plaintiff "specifically made them aware of his medical history," and "generalized complaints of pain [from handcuffs] are insufficient to show excessive force"); *Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009) ("At most, the record shows that [plaintiff] said that he did not want to be handcuffed because he thought it would hurt and that [plaintiff] complained generally about pain after he was handcuffed. These generalized complaints, without any elaboration regarding a preexisting injury or other infirmity, would not have placed a reasonable officer on notice that [plaintiff] would be injured by these actions"). Although Mr. Williams did not assert an excessive force claim against Officer Kehl, such a claim would fail as a matter of law in any event.

Because Officer Brooks and Officer Kehl acted reasonably in exerting force over Mr. Williams, they are entitled to summary judgment on Mr. Williams' excessive force claim under § 1983 (Count I).[15]

### C. Failure to Protect and Supervise

Mr. Williams asserts a Fourth Amendment claim under § 1983 against Officer Kehl for "failure to protect," alleging that: (1) he knew or should have known that Officer Brooks did not have a sufficient basis to stop Mr. Williams' car; (2) he "falsely claimed that he observed 'fighting'

---

[15] Given this conclusion, the Court need not reach Defendants' qualified immunity argument in connection with Mr. Williams' excessive force claim.

between Officer Brooks and Mr. Williams while he was approaching the scene in a moving vehicle and while he had an obstructed view"; (3) he was aware that "the actions or omissions of another officer constituted a violation of the Fourth Amendment…"; and (4) he "had a realistic opportunity to do something to prevent harm from occurring to Mr. Williams" and knowingly, intentionally, or with reckless disregard for Mr. Williams' rights failed to do so. [Filing No. 1 at 14-15.] Mr. Williams also asserts a "failure to protect and supervise" claim against Sergeant Trump, setting forth allegations similar to his claim against Officer Kehl, but adding that Sergeant Trump "had the ability to do something and prevent harm from occurring to Mr. Williams" because she was the supervising officer in charge at the scene, and because she "had the ability to review the video tape from the various vehicles and determine that Mr. Williams did not commit resisting law enforcement or battery on a police officer and could not be arrested for allegedly committing a traffic violation." [Filing No. 1 at 16.]

Defendants argue in support of their motion that Mr. Williams' "failure to protect" claims fail because no constitutional violation occurred as a result of Officer Brooks' actions. [Filing No. 41 at 33.] In any event, Defendants argue, Officer Kehl had no reason to believe Mr. Williams' rights were being violated because he observed Mr. Williams using force against Officer Brooks, and not the opposite. [Filing No. 41 at 33-34.] They also assert that Mr. Williams' claim against Sergeant Trump fails because "[t]here is no recognized constitutional right to be released or protected by supervising officers after the underlying constitutional violation has been committed," and that Sergeant Trump had no duty to investigate further because "[o]nce a police officer finds probable cause an officer is under no duty to investigate further." [Filing No. 41 at 34 (emphasis omitted).]

In response, Mr. Williams argues that Officer Kehl failed to protect him from Officer Brooks because: (1) he heard Officer Brooks say that Mr. Williams was "acting like he had an attitude," but then "left Mr. Williams at the mercy of Officer Brooks"; (2) he "exposed Mr. Williams to the danger of an agitated officer"; and (3) he failed to prevent or stop Mr. Williams' unlawful arrest, even though he could have reviewed the video.  [Filing No. 49 at 20.]  As to Sergeant Trump, Mr. Williams responds that even though she reviewed the video, she failed to stop or prevent his unlawful arrest, and failed to stop or address the pain Mr. Williams was suffering from the handcuffs.  [Filing No. 49 at 21.]

On reply, Defendants argue that Officer Kehl was not present for much of Mr. Williams' initial interaction with Officer Brooks and that, when he returned to the scene, he observed Mr. Williams throw an elbow at Officer Brooks and "had no reason to dispute [Officer] Brooks' claim that he committed a traffic violation and resisted arrest."  [Filing No. 55 at 9-10.]  Defendants contend that Officer Kehl had no authority to override Officer Brooks' conclusions, nor was he obligated to conduct a more thorough investigation.  [Filing No. 55 at 10.]  Further, they argue that Sergeant Trump did not even arrive at the scene until after Mr. Williams was handcuffed, and that she fulfilled her duty as a shift supervisor by interviewing Officers Brooks and Kehl and Mr. Williams.  [Filing No. 55 at 10.]

"[A]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring."  *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (emphasis in original) (citation and quotation

marks omitted).  The Court has already concluded, based on the undisputed facts, that neither Officer Brooks nor Officer Kehl violated Mr. Williams' constitutional rights.  Accordingly, any claim that Officer Kehl or Sergeant Trump should have intervened to prevent a violation of those rights fails as a matter of law.[16]  *See* *Leaf v. Shelnutt*, 400 F.3d 1070, 1092 (7th Cir. 2005) (failure to intervene claim failed where court had determined that other officers' actions did not amount to a constitutional violation).  The Court grants summary judgment to Officer Kehl and Sergeant Trump on Mr. Williams' "failure to protect" and "failure to protect and supervise" claims (Counts IV and V).

## IV.
### CONCLUSION

For the foregoing reasons, the Court finds that Defendants are entitled to judgment as a matter of law on all of Mr. Williams' claims.  Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment.  [Filing No. 40.]  Final judgment will enter accordingly.

March 9, 2015

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

---

[16] To the extent Mr. Williams claims that Sergeant Trump should have taken action to address his complaints that his handcuffs were too tight, the Court notes that Mr. Williams does not allege this in his Complaint or address it in his response brief.  In any event, as discussed above, Mr. Williams' generalized complaints that his handcuffs were too tight are not enough to support a constitutional violation.  See *Stainback*, 569 F.3d at 773.  Accordingly, any claim that Sergeant Trump failed to prevent a constitutional violation based on those complaints also fails.